# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

ROBERTO A. TORRES,

*Plaintiff,*

vs.

Case No. 13-1245-EFM

BODYCOTE INTERNATIONAL , *et al.*,

*Defendants.*

## MEMORANDUM AND ORDER

Plaintiff Roberto A. Torres ("Plaintiff") seeks monetary damages, including attorney's fees, from his past employer, Defendant Bodycote Thermal Processing, Inc. ("Defendant") for alleged discrimination, harassment, and retaliation in violation of the Americans with Disabilities Act of 1990 ("ADA"), [1] the Age Discrimination in Employment Act of 1967 ("ADEA"),[2] and Title VII of the Civil Rights Act of 1974 ("Title VII").[3] This matter is before the Court on Defendant's Motion for Summary Judgment (Doc. 29), Plaintiff's Motions for Summary Judgment (Docs. 34 and 51), and Plaintiff's Motion to Compel (Doc. 45). For the reasons stated

---

[1] 42 U.S.C. § 12101 *et seq.*

[2] 29 U.S.C. § 621 *et seq.*

[3] 42 U.S.C. § 2000e *et seq.*

below, Plaintiff's Motion to Compel and Motions for Summary Judgment are denied. Defendant's Motion for Summary Judgment is granted.[4]

## I. Factual and Procedural Background[5]

Plaintiff is fifty-one years old and is of Mexican national origin/ancestry, having moved to the United States from Mexico in 1986. In October 2011, he began employment as a parts inspector with the Metal Improvement Company ("MIC") at its Ida Street facility ("Ida facility") in Wichita, Kansas. At the time, MIC operated two additional Wichita facilities, one on McLean Street ("McLean facility") and one on West Street ("West facility"). In late March 2012, Defendant acquired all three Wichita MIC facilities. Plaintiff continued to work as an inspector at the Ida facility after the acquisition.

In August 2012, Plaintiff contacted Rosie Mendez ("Mendez"), Defendant's Regional Human Resources Manager, claiming that his supervisor, Billy Daniels ("Daniels"), harassed him and used ethnic and racial slurs. Plaintiff also complained about his coworkers' vulgar use of the Spanish language and reported that he had been accused of teaching his fellow employees bad words in Spanish. Mendez notified Gregory Lewis ("Lewis"), Director of Human Resources, of Plaintiff's complaints. On August 20-21, 2012, Lewis conducted an investigation of Plaintiff's complaints and interviewed Plaintiff and other workers at the Ida facility. During

---

[4] A general note about the parties in this case: Plaintiff initially filed his case against Bodycote International. Bodycote International is the wholly-owned subsidiary of Bodycote plc, which is a United Kingdom publicly listed company that is in the business of heat treatment, spray coating, and other metallurgical services, primarily in the aerospace, defense, and energy sectors. Bodycote Thermal Processing, Inc. is the primary operating company for Bodycote International's approximately sixty United States facilities. As such, it was determined that Bodycote Thermal was the proper party. Bodycote International was officially dismissed from the case on October 15, 2013.

[5] In accordance with summary judgment procedures, the Court has set forth the uncontroverted facts and they are related in the light most favorable to the non-moving party. As noted by the Pretrial Order (Doc. 35), issued on March 3, 2014, there are no uncontroverted facts in this case. The Court will therefore include the allegations of both parties, in the event that the allegations differ.

the course of his investigation, Lewis learned that there may have been some racially charged comments made at the Ida facility but that such behavior occurred while the facility was still under MIC ownership. Specifically, Lewis' investigation disclosed that one of Plaintiff's coworkers, Jared Jackson ("Jackson"), had called a third employee, Anthony Roll ("Roll"), a "pollo," the Spanish word for chicken, and had done so in the presence of Plaintiff. It was reported that Plaintiff and Jackson laughed and Roll told Plaintiff not to speak Spanish in the workplace. Plaintiff admits that the inappropriate comments were made during MIC's ownership and acknowledged that no derogatory comments had been made after Defendant acquired the Ida facility. Nonetheless, Lewis decided that all Ida facility employees would undergo additional workplace harassment training.

Plaintiff also complained to Production Manager Gary Sommers ("Sommers") that he was being "picked on" by Daniels. In his affidavit, Sommers stated that Plaintiff's complaints were job related and included allegations that Daniels was pressuring Plaintiff to complete more work than was reasonable and that he was being required to inspect more parts than other inspectors. Sommers investigated the complaints and found them to be unsubstantiated.

On September 18, 2012, Plaintiff and one of his co-workers, Rodino Morgan ("Morgan"), engaged in a verbal confrontation, allegedly as a result of Morgan moving some boxes that Plaintiff needed. During the altercation, Plaintiff suggested that the two "take it outside." Lewis also investigated this incident and ultimately recommended that both Plaintiff and Morgan be terminated for violating Defendant's workplace violence policy. Management at the Ida facility chose to retain both parties but issued them both employee warnings and progressive disciplinary notices.

On September 19, 2012, and while Lewis was at the Ida facility conducting the workplace harassment training, Plaintiff approached Lewis and requested a transfer to the West facility, citing his complaints against Daniels as well as the incident with Morgan. Lewis informed Plaintiff that there were no open inspector positions at the West facility and that a transfer was not possible at that time. Later in the fall of 2012, Plaintiff and one of his co-workers were approached by Daniels and supervisor Joe Jenks ("Jenks") about possibly transferring to the second or third shift at the Ida facility. Both parties indicated that they did not wish to change shifts. No shift change occurred.

In accordance with Defendant's normal operating procedure, the three Wichita facilities were ultimately converted to "24/7" operations, meaning that employees typically worked three twelve-hour shifts, followed by two days off. The Ida facility was the last Wichita facility to be so modified. Defendant required that each twelve-hour shift be staffed by an inspector. Plaintiff was transferred to the twelve-hour shift at the end of 2012.[6] Plaintiff's schedule thereafter became 6:00 a.m. to 6:00 p.m. for three consecutive days, followed by two days off. He worked this twelve-hour shift from the end of 2012 through March 24, 2013.

Around this time, Plaintiff had a regular check-up with his family physician. Given Plaintiff's diabetes and issues with blood sugar, his doctor recommended that Plaintiff work only eight-hour daily shifts. Defendant immediately reduced Plaintiff's work schedule to an eight-hour shift but kept him on the same three day on/two day off schedule. This meant that some weeks Plaintiff would not work a full forty-hour week. In an effort to accommodate Plaintiff's medical restrictions and desire to work a forty-hour week, and since no Monday through Friday,

---

[6] Defendant admits that one inspector, Roll, remained on an eight-hour daily shift but contends that this was because Roll also served as a quality control inspector.

eight-hour day shift existed at the Ida facility, Plaintiff's supervisors proposed the following four alternatives: (1) move to a weekend shift; (2) keep his current schedule at the Ida facility; (3) transfer to a shipping and receiving position at the McLean facility, although the position paid less; or (4) transfer as an inspector to the McLean facility making the same hourly rate but working second shift, 3:30 p.m. to midnight. Each of these options, with the exception of number two, guaranteed Plaintiff a forty-hour week and had been cleared with Human Resources.

Plaintiff rejected the first option, citing religious reasons. He also rejected the second and third options, as they did not afford him a consistent forty hours per week and because of the wage reduction, respectively. Plaintiff therefore agreed to the final option, a transfer to the McLean facility on second shift. His transfer took place in mid-April 2013. On May 16, 2013, Plaintiff's supervisors learned, from Plaintiff's doctor, that his eight-hour restriction was only scheduled to last twelve weeks. Even though this twelve-week period ended in June 2013, Plaintiff was never moved back to a twelve-hour shift and was instead allowed to remain on the eight-hour shift at the McLean facility. Plaintiff never sought to return to the twelve-hour day shift at the Ida facility.

In late May 2013, it came to the attention of the McLean facility's manager that Plaintiff had clocked out early two days in a row without any authorization or notice to his supervisors, a violation of Defendant's personnel policies. Plaintiff admitted that he had not requested permission to leave work early but testified that "[he didn't] think it's [his] responsibility to call anybody."[7] Plaintiff was issued an employee warning and progressive discipline notice on June

---

[7] Doc. 30, Attachment 1, at 19.

10, 2013. In late June 2013, it was discovered that Plaintiff had only inspected two or three parts of a 500-part order but had certified that all of the parts had been inspected. During a meeting with his supervisors on July 2, 2013, Plaintiff admitted that he had only checked two or three of the parts but claimed that he was instructed by the plant manager that that was all he was required to do. He was not disciplined or otherwise reprimanded for his failure to inspect but did ask for additional training.

Shortly thereafter, Plaintiff's initials appeared on a route card indicating that he had once again conducted an incomplete inspection of an order's total parts. When confronted about this matter, Plaintiff indicated that the initials on the route card were not his. It was later discovered that another employee, Kim Horn ("Horn"), had improperly signed Plaintiff's initials on the card. Plaintiff was not disciplined for this incident.

Simultaneous to all of these issues, the inspection department at the McLean facility was relocated next to the metallurgical lab. For purposes of plant efficiency, regional and facility managers determined that it was necessary to cross-train the McLean facility inspectors, of which there were three, including Plaintiff, on micro-hardness testing in the metallurgical lab. The other two inspectors began this cross-training in June 2013. On July 9, 2013, McLean plant manager Lawrence Deitchler ("Deitchler") approached Plaintiff about beginning his cross-training. Plaintiff informed Deitchler that he would not attend this training without a wage increase. Deitchler told Plaintiff that the training was part of his job, but Plaintiff refused to participate without the wage increase. Two days later Deitchler again directed Plaintiff to begin the training. Plaintiff again refused.

Deitchler informed the officer manager and the regional general manager of Plaintiff's refusal. On at least three occasions, the regional general manager told Plaintiff that he must

participate in the cross-training. Each time, Plaintiff refused to do so without a wage increase. When Plaintiff was advised that he would be subject to a three-day suspension with pay pending investigation if he did not participate, he again refused. Plaintiff was suspended on July 11, 2013. On the suspension notice, Plaintiff indicated that he refused to undergo the training unless he received a raise. Plaintiff acknowledges his repeated refusals to participate in the training.

Following Plaintiff's suspension, the supervisors and human resources personnel unanimously decided that Plaintiff's refusal to participate in the cross-training absent a wage increase constituted insubordination under Defendant's policies. Defendant's Employee Handbook defines insubordination as "any willful, disrespectful or deliberate action or inaction that may result in a refusal to work or to obey a legitimate order, as directed by a supervisor, or as prescribed by rules, procedures or policies." The Handbook also established a progressive discipline system. Defendant, however, "reserve[d] the right to skip, advance or repeat any level of discipline if it deems appropriate. Further, [Defendant] reserve[d] the right to terminate employees at any time without prior discipline." As such, on July 16, 2013, Plaintiff was terminated for insubordination.

In addition to his internal complaints, Plaintiff filed a charge of discrimination against Defendant with the Equal Employment Opportunity Commission ("EEOC") on March 26, 2013, alleging discrimination based on race, national origin, age, and disability for the period of time between November 1, 2011, and March 11, 2013. Specifically, Plaintiff complained about Daniels' harassment, the "chicken" incident, the results of Lewis' investigations, the denial of a transfer to another facility, and the transfer to the twelve-hour shift. Plaintiff also claimed that he was threatened for using his cell phone, that Sommers turned off his radio, and that he was threatened with discharge for not inspecting parts in a timely manner.

On May 13, 2013, Plaintiff filed a second charge of discrimination with the EEOC complaining about his transfer to the McLean facility and about the incident with Horn. Approximately two months later, on August 23, 2013, Plaintiff filed a third charge complaining about the inspection incidents and his termination. The EEOC thereafter issued a right to sue letter.

Plaintiff initially filed a Complaint in this Court on June 27, 2013, against Bodycote International alleging discrimination under Title VII, the ADA, and the ADEA, as well as harassment and retaliation. Once Plaintiff was made aware of the proper party to this suit, he filed an Amended Complaint against Defendant on October 15, 2013, alleging: (1) discrimination based on race, national origin, disability, and age; (2) retaliation; and (3) harassment. Defendant now seeks summary judgment on all of Plaintiff's claims. Plaintiff has filed two cross-motions for summary judgment as well as a motion to compel. Because the outcome of Plaintiff's motion to compel bears directly on the current motions for summary judgment, the Court addresses this issue first.

## II. Motion to Compel

At the pretrial conference, held on February 20, 2014, before Magistrate Kenneth G. Gale, Defendant was ordered to produce the discovery materials requested in Plaintiff's February 18, 2014, "Motion for Order" (Doc. 31). Specifically, Defendant agreed to produce wage and hour information of employees assigned to the inspection departments during the period of time that Plaintiff was an inspector, namely April 2012 through April 15, 2013, at the Ida facility and April 15, 2013, through July 16, 2013, at the McLean facility. Defendant also agreed to produce whatever additional documentation had not yet been produced regarding the failure to inspect parts incidents. Defendant requested that a protective order be entered before it produced

confidential personnel records, to which Plaintiff agreed.  A protective order was entered by Magistrate Gale on February 21, 2014.

On March 4, 2014, Defendant provided Plaintiff with wage and hour records for all employees assigned to or working in the inspection department at the Ida facility between April 2012 and April 2013, and at the McLean facility between April 2013 and July 2013.  Defendant also produced copies of route cards and an Employee Warning and Progressive Discipline Notice issued to another employee for falsification of inspection records.  Plaintiff thereafter contacted the Magistrate's chambers, stating that he was dissatisfied with Defendant's responses.  On March 10, 2014, Magistrate Gale directed Plaintiff to put in writing what additional documents he wanted and ordered Defendant to respond to the written request.  On March 14, 2014, Defendant provided Plaintiff with a spreadsheet listing hourly wages of certain employees working at the Ida and McLean facilities for the period of Plaintiff's employment.  Again, Plaintiff requested additional documentation concerning the wages, hours worked, and raises received for certain Ida and McLean facility inspectors.  He also requested the inspection sheets from July 2-3, 2013.

On March 21, 2014, Defendant produced additional documents relating to one of the parts inspection incidents.  It also advised Plaintiff that the employees identified in his request for additional documentation were not assigned to the inspection departments at either facility.  As such, Defendant declined to produce wage and hour documentation.  On March 26, 2014, Plaintiff filed his current motion to compel (Doc. 45) accusing Defendant of refusing to provide information.  He requests that the Court order Defendant to jail until such time as his discovery requests are complete.  Plaintiff also seeks to increase his monetary demand to fifty million dollars.

As an initial matter, Plaintiff provides no proof that Defendant has failed to comply with Magistrate Gale's previous orders directing Defendant to turn over information relating to the wages and hours of other inspectors or the inspection incidents. With regard to Plaintiff's request for wage and hour information for non-inspector employees, this Court relies on Rule 26(b) of the Federal Rules of Civil Procedure that allows a party to obtain discovery on any nonprivileged matter that is *relevant* to any party's claim or defense.[8] Relevance is broadly construed, and if any possibility exists that the discovery sought may be relevant to a party's claim or defense, such request should be considered relevant.[9]

Here, Plaintiff provides no justification as to why wage and hour information for non-inspector employees may be relevant to his claims against Defendant. Furthermore, according to the Pretrial Order, the parties agreed that the scope of discovery was to be limited to the requests made in Plaintiff's Motion for Order, which only requested wages and hours worked for all *inspectors*.[10] Therefore, Plaintiff's Motion to Compel (Doc. 45) is hereby denied.

### III. Legal Standard for Summary Judgment

Summary judgment is appropriate if the moving party demonstrates that there is no genuine issue as to any material fact, and the movant is entitled to judgment as a matter of law.[11] A fact is "material" when it is essential to the claim, and the issues of fact are "genuine" if the

---

[8] FED. R. CIV. P. 26(b)(1).

[9] *Gipson v. Southwestern Bell Tel. Co.*, 2009 U.S. Dist. LEXIS 109083, at *8 (D. Kan. Nov. 23, 2009) (citing *Centurion Indus., Inc. v. Warren Steurer & Assoc.*, 665 F.2d 323, 326 (10th Cir. 1981)); *Jones v. Wet Seal Retail, Inc.*, 245 F.R.D. 724, 725 (D. Kan. 2007).

[10] Doc. 35, at 3-4.

[11] FED. R. CIV. P. 56(a).

proffered evidence permits a reasonable jury to decide the issue in either party's favor.[12]   The movant bears the initial burden of proof and must show the lack of evidence on an essential element of the claim.[13]   The nonmovant must then bring forth specific facts showing a genuine issue for trial.[14]   These facts must be clearly identified through affidavits, deposition transcripts, or incorporated exhibits – conclusory allegations alone cannot survive a motion for summary judgment.[15]   The court views all evidence and reasonable inferences in the light most favorable to the non-moving party.[16]

## IV.    Analysis

**Harassment**

Plaintiff alleges that he was subjected to racial and/or national origin harassment due to Daniels' harassment and use of ethnic and racial slurs and his coworkers' alleged order that Plaintiff not speak Spanish in the workplace (i.e. the "chicken" incident).

To succeed on a racial harassment claim at the summary judgment stage, a plaintiff "must show that a rational jury could find that the workplace [was] permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment."[17]   To determine whether

---

[12] *Haynes v. Level 3 Communs.*, 456 F.3d 1215, 1219 (10th Cir. 2006).

[13] *Thom v. Bristol-Myers Squibb Co.*, 353 F.3d 848, 851 (10th Cir. 2004) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986)).

[14] *Garrison v. Gambro, Inc.*, 428 F.3d 933, 935 (10th Cir. 2005).

[15] *Mitchell v. City of Moore, Okla.*, 218 F.3d 1190, 1197 (10th Cir. 2000) (citing *Adler v. Wal-Mart Stores*, 144 F.3d 664, 670 (10th Cir. 1998)).

[16] *LifeWise Master Funding v. Telebank*, 374 F.3d 917, 927 (10th Cir. 2004).

[17] *Mendia v. Hawker Beechcraft Corp.*, 2008 U.S. Dist. LEXIS 3879, at *19 (D. Kan. Jan. 17, 2008) (quoting *McCowan v. All Star Maint.*, 273 F.3d 917, 923 (10th Cir. 2001)).

a working environment is sufficiently hostile or abusive, a court must examine all the circumstances, including: "(1) the frequency of the discriminatory conduct; (2) the severity of the conduct; (3) whether the conduct is physically threatening or humiliating, or a mere offensive utterance; and (4) whether the conduct unreasonably interferes with the employee's work performance."[18]  The working environment "must be both subjectively and objectively hostile or abusive."[19]

Based on these standards, Plaintiff fails to establish the existence of a racially hostile working environment.  Plaintiff alleges that Daniels' statements were made between November 2011 and March 2012 when Plaintiff's employer was MIC, not Defendant.  He admits that once Defendant acquired MIC, Daniels made no further racially or ethnically derogatory comments.  He also admits that he was assured by management that he could speak Spanish in the workplace.  Additionally, Plaintiff fails to provide any evidence that Daniels' statements were sufficiently severe or pervasive to create an objectively hostile or abusive working environment.  "To establish a racially hostile work environment . . . plaintiffs must prove more than a few isolated incidents of racial enmity."[20]  "Casual comments, or accidental or sporadic conversation, will not trigger equitable relief pursuant to the statute."[21]  Here, in his October 23, 2013, deposition, Plaintiff claims that the harassing insults occurred every day from the time that he began employment with MIC in October 2011.  Plaintiff fails to provide any additional evidence

---

[18] *Id.* (citing *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993)).

[19] *Id.*

[20] *Hicks v. Gates Rubber Co.*, 833 F.2d 1406, 1412 (10th Cir. 1987) (quoting *Snell v. Suffolk Co.*, 782 F.2d 1094, 1103 (2d Cir. 1986)).

[21] *Id.*

to support this allegation. Furthermore, Plaintiff worked for MIC and Defendant for more than two years and, in that time, made only the one complaint.

Even if Plaintiff could sufficiently set forth a case for a hostile working environment/harassment, he fails to impute that liability to Defendant. "An employer may be directly or vicariously liable for a hostile workplace.[22] "An employer is directly liable for a hostile work environment created by an employee is the employer's negligence causes the actionable work environment."[23] "An employer is negligent . . . if it knew or should have known about the conduct and failed to stop it."[24] The United States Supreme Court has held that,

> [t]o avoid vicarious liability, an employer can take advantage of an affirmative defense – the *Faragher* defense – by showing that the employer 'exercised reasonable care to avoid harassment and to eliminate it when it might occur,' and that the complaining employee 'failed to act with like reasonable care to take advantage of the employer's safeguards.'[25]

Here, Defendant took appropriate remedial action after Plaintiff made his harassment allegations in August 2012. Lewis came to the Ida facility and: (1) interviewed Plaintiff, other employees, and supervisors; (2) determined that the offensive comments had been made during MIC's operation of the Ida facility; (3) directed supervisors at the Ida facility that there were no prohibitions on the use of Spanish in the workplace; and (4) gave additional harassment training to supervisors and employees. Plaintiff concedes that there was no further harassment at the Ida facility. Therefore, both prongs of the *Faragher* defense have been satisfied.

---

[22] *Debord v. Mercy Health Sys. of Kan., Inc.*, 737 F.3d 642, 650 (10th Cir. 2013) (citing *Burlington Indus. v. Ellerth*, 524 U.S. 742, 758-59 (1998)).

[23] *Id.* (quoting *Baty v. Willamette Indus.*, 172 F.3d 1232, 1241 (10th Cir. 1999)).

[24] *Id.* (quoting *Ellerth*, 524 U.S. at 759).

[25] *Id.* (quoting *Faragher v. City of Boca Raton*, 524 U.S. 775, 805 (1998)).

As such, Plaintiff fails to maintain a claim for harassment based on race or national origin under Title VII. The Court therefore grants Defendant's motion for summary judgment with regard to this issue.

**Race/National Origin Discrimination**

Defendant also seeks summary judgment on Plaintiff's claims of discrimination based on race and national origin. Title VII makes it unlawful "to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment because of such individual's race, color, religion, sex, or national origin."[26] Discrimination may be proven through either direct or indirect evidence of discrimination.[27] Here, Plaintiff fails to come forward with any direct evidence of discrimination. The Court must therefore determine if there is sufficient indirect evidence for Plaintiff to survive summary judgment.

In the absence of any direct evidence, courts in this Circuit have used the widely known analytical framework articulated in the Supreme Court case *McDonnell-Douglas Corp. v. Green*.[28] This framework first requires a plaintiff to establish a prima facie case of discrimination.[29] Once established, the defendant employer must offer a "legitimate nondiscriminatory reason for the adverse employment action."[30] The burden then shifts back to

---

[26] 42 U.S.C. § 2000e-2.

[27] *Kendrick v. Penske Transp. Servs., Inc.*, 220 F.3d 1220, 1225 (10th Cir. 2000) (internal citations omitted).

[28] 411 U.S. 792 (1973).

[29] *Smothers v. Solvay Chems., Inc.*, 740 F.3d 530, 538 (10th Cir. 2014) (citing *MacKenzie v. City & Cnty. of Denver*, 414 F.3d 1266, 1274 (10th Cir. 2005)).

[30] *Id.*

the plaintiff to show that "there is at least a genuine issue of material fact as to whether the employer's proffered legitimate reason is genuine or pretextual."[31]

## A. The prima facie case

To establish a prima facie case of discrimination based on race or national origin, a plaintiff must demonstrate "(1) membership in a protected class, (2) adverse employment action, and (3) disparate treatment among similarly situated employees."[32]  Plaintiff's argument fails under prongs two and three.

### 1. Adverse Employment Action

The Tenth Circuit has traditionally defined the phrase "adverse employment action" liberally, taking a "case-by-case approach, examining the unique factors relevant to the situation at hand."[33]  "An adverse employment action includes acts that 'constitute[] a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits."[34]  It is important to note that, because of this case-by-case approach, adverse employment actions are not limited to these specified acts.[35]

Here, Plaintiff alleges several adverse employment actions: (1) his written reprimand for the workplace violence incident involving Morgan, (2) being denied a requested transfer to the

---

[31] *Id.*

[32] *Monroe v. City of Lawrence*, 2014 U.S. Dist. LEXIS 9317, at *18-19 (D. Kan. Jan. 27, 2014) (quoting *Carney v. City & Cnty. of Denver*, 534 F.3d 1269, 1273 (10th Cir. 2008)).

[33] *Hillig v. Rumsfeld*, 381 F.3d 1028, 1031 (10th Cir. 2004) (quoting *Sanchez v. Denver Pub. Schs.*, 164 F.3d 527, 532 (10th Cir. 1998)).

[34] *Dick v. Phone Directories Co.*, 397 F.3d 1256, 1268 (10th Cir. 2005) (citing *Sanchez*, 164 F.3d at 532)).

[35] *EEOC v. C.R. Eng., Inc.*, 644 F.3d 1028, 1040 (10th Cir. 2011).

West facility in September 2012, (3) being asked to change to the second shift at the Ida facility, (4) placement on a twelve-hour shift, (5) transfer to the McLean facility in mid-April 2013, (6) accusations that he had damaged and failed to inspect parts, and (7) his termination in July 2013.[36]  With the exception of Plaintiff's termination, none of these actions constitute an adverse employment action.

With regard to Plaintiff's written reprimand for the workplace violence incident involving Morgan, Defendant acknowledges that both Plaintiff *and* Morgan received written disciplinary notices for their conduct.  However, while Lewis recommended that both employees be terminated, Ida facility management declined to terminate either Plaintiff or Morgan.  The Tenth Circuit has held that "[a] written warning *may* be an adverse employment action *only* if it effects a significant change in the plaintiff's employment status."[37]  Here, Plaintiff offers no evidence that this reprimand affected his employment at all.  As such, the written reprimand is not an adverse employment action.

With regard to Plaintiff's denied request to transfer to the West facility, Plaintiff was informed by Lewis that no such transfer was available because there were no open positions for an inspector at the West facility.  In his affidavit, Lewis affirmed that he had confirmed, prior to refusing Plaintiff's request, that there were no inspector or similar openings at the West facility.[38]  Plaintiff presents no evidence that this denial was because of his race or national origin.  Nor has he presented evidence of any repercussions because of his request.  With regard to being asked to

---

[36] The Court pauses here to note that Plaintiff's allegations of adverse employment actions are extremely unclear.  Therefore, the Court relies upon the evidence of record, as well as the facts and argument set forth in Defendant's motion for summary judgment, which Plaintiff does not contest, to render its decision.

[37] *Haynes*, 456 F.3d at 1224 (emphasis added).

[38] Doc. 30, Attachment 16, at 5.

switch shifts from first to second, Plaintiff himself confirms that he was not the only employee asked to do so. When both Plaintiff and the other employee declined to move to the second shift, both employees were allowed to continue working the first shift without a change in wage or hours. As such, neither incident constitutes an adverse employment action.

Plaintiff also complains about being required to work twelve-hour shifts beginning in the fourth quarter of 2012. However, Plaintiff was not the only inspector required to work such shifts. With the exception of Roll, who had to remain on an eight-hour schedule because of his additional duties as a quality control inspector, inspectors at all three of Defendant's Wichita facilities were moved to a twelve-hour schedule to accommodate Defendant's business needs.

In conjunction with the switch to twelve-hour days, Plaintiff complains that he was ultimately transferred to the second shift at the McLean facility in mid-April 2013. However, Plaintiff was only transferred because his doctor ordered him to not work any shifts longer than eight hours. In an effort to accommodate Plaintiff's disability, Defendant gave Plaintiff his choice of four options: (1) transfer to weekend shifts, (2) keep his current eight-hour shifts at the Ida facility with the understanding that he may not always be able to work forty hours per week, (3) transfer to a shipping and receiving clerk position at the McLean facility where he would be ensured forty hours per week but at a lesser hourly rate, or (4) transfer to a second shift inspector position at the McLean facility working only eight-hour shifts whereby Plaintiff would be guaranteed forty hours per week. Plaintiff *chose* option four. Furthermore, courts in this Circuit have previously held that shift changes are typically not considered materially adverse actions.[39]

---

[39] *See Jones v. Wichita State Univ.*, 528 F. Supp. 2d 1222, 1242-43 (D. Kan. 2007); *see also Burger v. Wolf Creek Nuclear Operating Corp.*, 2012 U.S. Dist. LEXIS 120927, *10 (D. Kan. Aug. 27, 2012)).

As such, Plaintiff cannot be said to have suffered an adverse employment action with regard to his transfer.

Finally, with regard to Plaintiff's inspection of parts and the alleged forged signature on the check sheets, while Plaintiff alleges that his supervisors "had it in" for him, Plaintiff provides no evidence that he suffered any adverse employment action as a result of his failure to properly inspect all of the parts assigned to him. Ida facility Operations Manager Ni'Chelle Bruce ("Bruce") affirmed that Plaintiff was not disciplined or otherwise reprimanded for his failure to inspect parts or the improper signatures. As such, Plaintiff did not suffer any adverse employment action with regard to these inspection incidents.

## B. Plaintiff's Termination

Although there is no doubt that Plaintiff suffered an adverse employment action when he was terminated in July 2013, Plaintiff still fails to show disparate treatment among similarly situated employees. "Individuals are considered similarly-situated when they deal with the same supervisor, are subjected to the same standards governing performance evaluation and discipline, and have engaged in conduct of comparable seriousness."[40] There is simply no evidence in the record that any of Plaintiff's fellow inspectors received different treatment with regard to the cross-training. This training was training that *all* inspectors assigned to the McLean facility were required to undergo. Plaintiff presents no evidence that any of the other inspectors received a pay increase for or as a result of this training. Rather, all evidence suggests that this cross-training was required of all inspectors at the McLean facility as part of their regular job duties in order to enhance plant efficiency and productivity. Plaintiff was ultimately terminated because

---

[40] *EEOC v. PVNF, LLC,* 487 F.3d 790, 801 (10th Cir. 2007) (citations omitted).

of his refusal to participate in training that was required of every similarly situated employee and ordered by his supervisors.

Even if Plaintiff *could* maintain a prima facie case for his termination, Defendant provides a legitimate, non-discriminatory business reason for his termination: Plaintiff repeatedly refused to undergo cross-training in the metallurgical laboratory at the McLean facility without a pay raise.  Under Defendant's personnel policies, Plaintiff's refusal constituted insubordination, which was a ground for termination.  The burden therefore shifts back to Plaintiff to show that "there is at least a genuine issue of material fact as to whether the employer's proffered legitimate reason is genuine or pretextual."[41]  "A plaintiff demonstrates pretext by showing either that a discriminatory reason more likely motivated the employer or that the employer's proffered explanation is unworthy of credence."[42]  A plaintiff usually makes a showing of pretext in one of three ways:

> (1) with evidence that the defendant's stated reason for the adverse employment action was false; (2) with evidence that the defendant acted contrary to a written company policy prescribing the action to be taken by the defendant under the circumstances; or (3) with evidence that the defendant acted contrary to an unwritten policy of contrary to company practice when making the adverse employment decision affecting the plaintiff.[43]

Here, Plaintiff fails to even make a claim of pretext, let alone offer evidence to support any of these methods. There is no evidence to suggest that Defendant acted in any way except in accordance with its personnel policies, which define insubordination as any "willful, disrespectful or deliberate action or inaction that may result in a refusal to work or to obey a

---

[41] *Smothers*, 740 F.3d at 538 (citing *MacKenzie*, 414 F.3d at 1274).

[42] *Id.* at 539 (quoting *Zamora v. Elite Logistics, Inc.*, 478 F.3d 1160, 1166 (10th Cir. 2007)).

[43] *Kendrick*, 220 F.3d at 1230 (internal citations omitted).

legitimate order, as directed by a supervisor, or as prescribed by rules, procedures or policies."[44] Plaintiff blatantly and admittedly failed to comply with a legitimate order of his supervisors. Therefore, Plaintiff fails to establish pretext.  As such, this Court grants Defendant's motion for summary judgment with respect to Plaintiff's claims of race/national origin discrimination.

**Age Discrimination**

Plaintiff also alleges discrimination based on age.  Under the ADEA, it is "unlawful for an employer . . . to discriminate . . . against any individual . . . because of such individual's age."[45]  Plaintiff does not contend that he has evidence of direct discrimination.  The Court therefore invokes the *McDonnell-Douglas* burden-shifting framework.[46]

In addition to the requirements necessary to establish a prima facie case under Title VII, a plaintiff asserting a claim of age discrimination must also show that he was qualified for the position at issue and that he was treated less favorably than others not in the protected class.[47] To be considered a member of the applicable protected class, the plaintiff must establish that he is at least forty years old.[48]  For purposes of summary judgment, Defendant does not appear to contest that Plaintiff was a member of the protected class or that he was qualified for his position.  As such, all that remains is for Plaintiff to show that he suffered an adverse employment action and that he was treated less favorably than others not in the protected class.

---

[44] Doc. 30, Attachment 2, at 8.

[45] 29 U.S.C. § 623(a)(1).

[46] *See Lopez v. Reser's Fine Foods, Inc.*, 2013 U.S. Dist. LEXIS 175789 (D. Kan. Dec. 16, 2013) (applying *McDonnell-Douglas* to cases of age discrimination).

[47] *TWA, Inc. v. Thurston*, 469 U.S. 111, 121 (1984).

[48] *Whittington v. Nordam Group, Inc.*, 429 F.3d 986, 992 (10th Cir. 2005) (internal citations omitted).

As analyzed thoroughly in the Court's discussion of Plaintiff's Title VII discrimination claims, Plaintiff fails to establish an adverse employment action with regard to any of his claims except for his termination. Likewise, Plaintiff fails to present any evidence that he received different treatment than anyone not in the protected age class. Furthermore, much like was the case with Plaintiff's Title VII discrimination claims, Plaintiff also fails to establish pretext in response to Defendant's proffered legitimate, non-discriminatory reason for Plaintiff's termination. As such, the Court grants Defendant's motion for summary judgment with regard to Plaintiff's claim of age discrimination.

**Disability Discrimination**

The ADA prohibits "discriminat[ion] against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment."[49] Plaintiff does not contend that he has evidence of direct discrimination. Therefore, the Court again invokes the *McDonnell-Douglas* burden-shifting framework.[50]

To establish a prima facie case of disability discrimination, Plaintiff must present evidence that he "(1) is a disabled person as defined by the ADA; (2) is qualified, with or without reasonable accommodation, to perform the essential functions of the job held or desired; and (3) suffered discrimination by an employer or prospective employer because of that disability."[51] Here, Defendant does not seem to contest that Plaintiff was disabled, as that term is

---

[49] 42 U.S.C. § 12112(a).

[50] *See Morgan v. Hilti*, 108 F.3d 1319, 1323 (10th Cir. 1997) (applying the *McDonnell-Douglas* framework to claims of disability discrimination).

[51] *C.R. Eng.*, 644 F.3d at 1037-38 (quoting *Justice v. Crown Cork & Seal Co., Inc.*, 527 F.3d 1080, 1086 (10th Cir. 2008)).

defined by the ADA, or that he was qualified to perform the essential functions of his job. Therefore, the only issue is whether Plaintiff suffered discrimination because of his disability. In other words, the Court must determine whether Plaintiff suffered an adverse employment action because of the disability.

As discussed above, with the exception of his termination, Plaintiff presents no evidence of an adverse employment action because of his diabetes. While Plaintiff was indeed transferred to the second shift at the McLean facility, this transfer was Plaintiff's *choice*. Furthermore, even when Plaintiff was cleared to return to a normal working schedule, he was allowed to remain on eight-hour shifts even though inspectors were required to work twelve-hour shifts. Plaintiff did not incur a significant change in benefits as a result of this transfer: there was no reduction in hours or hourly wages. Neither was Plaintiff's transfer accompanied by significantly different responsibilities. Plaintiff provides no evidence that would lead the Court to believe that his job duties at the McLean facility involved anything more than what he was doing at the Ida facility. The only information Plaintiff claims to provide in support of his disability discrimination claim is not really evidence in support at all. At his deposition, Plaintiff testified as follows:

> Q:    Did you initiate the requested move from twelve-hour shifts to eight-hour shifts?
>
> A:    Yes, when I went to the doctor.
>
> Q:    Now, sir, after you got the doctor's note, were you ever again required to work a 12-hour shift?
> . . .
>
> A:    No.
>
> Q:    And you were accommodated by what the doctor said you needed to do, the company accommodated you, is that correct?

A:     Well, I don't know if they accommodated, I mean I guess in their own way.

Q:     Well, you were physically able to do the job, is that correct?

A:     Of course, the doctor didn't give me any restriction, he just said I had to work eight hours.

Q:     And they did limit your work to eight hours?

A:     And in that eight-hour period I did more work than those who were working twelve hours.

Q:     Now, you were transferred to the facility and you worked second shift, is that correct?

A:     Yes, after I got no other option and I was sent over there.

Q:     And did you expect that – did you work 40 hours at that new position?

A:     Yes, and in all different companies, whenever you go to second, you get a raise, and I didn't.

Q:     And are you alleging that other people got a raise for moving to a different shift at Bodycote?

A:     Why do you ask me that, I don't have access to that information.
…

Q:     And why – why do you think you were deserving of a raise?

A:     First, because I worked better than the rest, I did more work.

Q:     And that's your opinion?

A:     You have the company papers.  It's not what I say, the papers show it.[52]

The record shows that Plaintiff neither requested nor obtained any information or evidence to support his allegation.

---

[52] Doc. 30, Attachment 1, at 16.

Furthermore, much like was the case with Plaintiff's Title VII and age discrimination claims, Plaintiff fails to establish pretext in response to Defendant's proffered legitimate, non-discriminatory reason for Plaintiff's termination.  As such, the Court grants Defendant's motion for summary judgment with regard to Plaintiff's claim of disability discrimination.

**Retaliation**

Finally, Plaintiff alleges that he was the victim of retaliation, as that term is defined under Title VII, for his administrative charges of discrimination filed on March 26, 2013, and May 13, 2013.  Again, Plaintiff offers no *direct* evidence of this alleged retaliatory behavior.  The Court therefore analyzes Plaintiff's retaliation claims using the burden-shifting framework set forth under *McDonnell-Douglas*.[53]

**A.  Prima facie case**

To establish a prima facie case for retaliation, a plaintiff must show: "(1) that he engaged in protected opposition to discrimination, (2) that a reasonable employee would have found the challenged action materially adverse, and (3) that a causal connection existed between the protected activity and the materially adverse action."[54]

Defendant does not contest that Plaintiff engaged in protected activity, recognizing Plaintiff's March 26, 2013, and May 13, 2013, EEOC charges as such activity.  Therefore, only the latter two elements are at issue.

The anti-retaliation provision of Title VII

protects an individual not from *all* retaliation, but from retaliation that produces an injury or harm . . . [A] plaintiff must show that a reasonable employee would

---

[53] *See Proctor v. UPS*, 502 F.3d 1200, 1207 (10th Cir. 2007).

[54] *Id*. at 1208 (citing *Argo v. Blue Cross & Blue Shield of Kans., Inc.*, 452 F.3d 1193, 1202 (10th Cir. 2006)).

have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination.[55]

Although Plaintiff does not allege specific retaliatory actions, the Court can infer, based upon the timing and content of Plaintiff's administrative filings that the alleged actions include: (1) Plaintiff's transfer to the McLean facility, and (2) Plaintiff's discharge from employment.

Plaintiff alleges that he was transferred to the McLean facility two weeks after his March 26, 2013, administrative filing. While this is true, it was Plaintiff's *choice* to transfer to the McLean facility in order to both accommodate his disability and to ensure that he was able to work forty hours per week.  As noted previously, soon after Defendant took over operations of MIC, it made the decision to convert each of the three Wichita facilities to twelve-hour shifts, which meant that inspectors, including Plaintiff, were required to work three twelve-hour shifts in a row, followed by two days off.  When it became clear that Plaintiff could no longer work such shifts, Plaintiff was allowed to work eight-hour shifts at the Ida facility under the same three days on/two days off model.  This reduction in hours, however, meant that Plaintiff sometimes failed to work forty hours per week.  Management therefore gave Plaintiff four options: (1) move to a weekend shift, (2) keep his current schedule at the Ida facility, (3) transfer to the McLean facility in a shipping and receiving clerk position that paid less, or (4) transfer to the McLean facility as an inspector making the same hourly rate but working second shift, 3:30 p.m. to midnight.  Of those options, Plaintiff *chose* to transfer to the second shift at the McLean facility. Plaintiff fails to show that he was transferred because of his March 26, 2013,

---

[55] *Burlington*, 548 U.S. at 67-68 (quoting *Rochon v. Gonzales*, 438 F.3d 1211, 1219 (D.C. Cir. 2006)).

administrative filing.  As such, Plaintiff therefore fails to show that his transfer constituted a materially adverse action.

With regard to Plaintiff's termination, although this is considered a materially adverse action on its face, Plaintiff still fails to demonstrate a causal connection between his protected activity and his termination.  In 2013, the Supreme Court altered its view of causation with regard to Title VII retaliation claims.  These claims are now subject to a heightened "but-for" causation standard.  Under this standard, "a plaintiff making a retaliation claim 'must establish that his or her protected activity was a *but-for* cause of the alleged adverse action by the employer."[56]  This standard "requires proof that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer."[57]  Plaintiff clearly cannot meet this heightened standard.  As explained at length above, Plaintiff was terminated because of his insubordination and fails to come forward with evidence to the contrary.

Therefore, the Court finds that Plaintiff is unable to maintain a prima facie case for retaliation, and summary judgment is granted on this issue.

**Plaintiff's Motions for Summary Judgment**

Plaintiff has filed two motions for summary judgment.  In the first motion dated February 28, 2014, Plaintiff requests summary judgment on the grounds that "the defendant has changed dates, names to his convenience from the original version, the original version was written for

---

[56] *Grote v. Beaver Express Serv., LLC*, 2013 U.S. Dist. LEXIS 115383, *22-23 (10th Cir. 2013) (*citing Univ. Of Tex. Southwestern Med. Ctr. v. Nassar*, 133 S. Ct. 2517, 2534 (2013) (emphasis added)).

[57] *Nassar*, 133 S. Ct. at 2533.

EEOC . . . ."[58]  In his second motion dated March 26, 2014, Plaintiff seeks summary judgment due to violations of the First Amendment.

Under Federal Rule of Civil Procedure 56, "[t]he court shall grant summary judgment if the movant shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law."[59]  Additionally,

> [a] party asserting that a fact cannot be or is genuinely disputed must support the assertion by: (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits, or declarations, stipulations . . . admissions, interrogatory answers, or other materials; or (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact."[60]

Plaintiff fails to provide, in either of his motions for summary judgment, a statement of material facts, a statement of the questions presented, or any argument as to why he is entitled to judgment.  In his first motion, it does not appear that Plaintiff is actually seeking summary judgment, given his statement that he "wants a trial with the defendant."[61]  Plaintiff's second motion requests summary judgment under the First Amendment.  As Defendant notes in its response, Plaintiff's claims revolve around alleged employment discrimination.  Other than in Plaintiff's second motion for summary judgment, no First Amendment claims have been raised, nor are they included in the final Pretrial Order.  As such, the Court will not consider these claims.

---

[58] Doc. 34, at 1.

[59] FED. R. CIV. P. 56(a).

[60] FED. R. CIV. P. 56(c)(1)(A)-(B).

[61] Doc. 34, at 2.

In support of his motions, Plaintiff separately submitted audiotapes of surreptitious recordings of conversations or meetings between Plaintiff and some of Defendant's employees, which Plaintiff alleges to be Sommers, Lewis, Mendez, Deitchler, and Regional General Manager Jeff Windschitl. Aside from Plaintiff's claim, there is no way to verify whose voices are actually on these recordings. Additionally, some of the conversations are in Spanish and large portions of the recordings are inaudible. There is no indication of when or where these conversations took place. What the Court *could* make out from the recordings seems to be conversations between Plaintiff and someone in a supervisory capacity who is offering to assist Plaintiff with any complaints or issues he may have.

The Court takes note of Plaintiff's *pro se* status, and acknowledges that, as a general rule, it must take additional precautions before ruling on a dispositive motion against a *pro se* litigant.[62] "A *pro se* litigant's pleadings are to be construed liberally and held to a less stringent standard than formal pleadings drafted by lawyers."[63] However, "a plaintiff's *pro se* status does not relieve him from complying with this court's procedural requirements."[64] Therefore, based on Plaintiff's procedural failures, Plaintiff's motions for summary judgment (Docs. 34 and 51) are denied.

---

[62] *See Murdock v. City of Wichita, Kan.*, 2012 U.S. Dist. LEXIS 132726, at *5 (D. Kan. Sept. 18, 2012) (discussing summary judgment standards concerning a *pro se* litigant's claim).

[63] *Hall v. Bellmon*, 935 F.2d 1106, 1110 (10th Cir. 1991).

[64] *Auld v. Value Place Prop. Mgmt., LLC*, 2010 U.S. Dist. LEXIS 14907, at *47 n.79 (D. Kan. Feb. 19, 2010) (citing *Barnes v. United States*, 173 F. App'x 695, 697 (10th Cir. 2006)).

**IT IS THEREFORE ORDERED** that Defendant's Motion for Summary Judgment (Doc. 29) is hereby **GRANTED**. Plaintiff's Motions for Summary Judgment (Docs. 34 and 51) are **DENIED**. Plaintiff's Motion to Compel (Doc. 45) is **DENIED**.

**IT IS SO ORDERED**.

Dated this 23rd day of May, 2014.

ERIC F. MELGREN
UNITED STATES DISTRICT JUDGE